Ms. Doe v. Evicore Healthcare, we have Mr. Stone for the appellant. I see you reserved three minutes for rebuttal, and you can begin whenever you're ready, Mr. Stone. Thank you. May it please the court. We believe that two key points should guide this court's analysis and make clear that the judge below was led into reversible error. First, the regulatory framework. This is not a fee for service or Part B case like Mike's v. Strauss or Chorch's. This is a Part C case, a government group insurance case. A case about pooled risk and capitated payments. And as we allege at paragraphs 9 through 15 of the complaint A135, and as discussed in detail in the Swobin case, the Ninth Circuit's opinion at 848 F3, 1161. Cited in our brief at 48, the government relies on MCOs to institute procedures to ensure that patients are entitled to care receive it. But it also does not want to pay for unnecessary care, as doing so ultimately increases the risk of the pool. Yes. Yes, Judge. I gather that the district court's problem, and the problem highlighted from time to time during the course of your litigation, is your lack of citations of specific instances of where the results were the payment of funds for the district court was looking for, give me examples. And I gather came up with somebody who had 200 visits to the doctor for his sprained ankle. That's one. Right. What, are you resisting doing that? Is there a principle? I don't quite understand. No, Judge. First of all, that's what I was trying to explain the framework. The framework and the reason we believe the judge just misunderstood what our allegations were is that Evercore was hired to perform a core function. And that core function was to manage the care. It was to do pre-approvals and utilization reviews to ensure that the risk data, ultimately what the government would be told the risk pool was for that population would be accurate, and that's an obligation. We cite this in our complaint in numerous places, paragraphs nine through 15. Under 9B, just to follow up on the Saxe question, under 9B, you have to give the who, when, what, and where, or you don't get to proceed. Or, if you were alleging on information and belief, you have to have some strong inference of CNTR. And I'm not sure where the strong inference would come from if you don't put what the rules were. The district court also noted that you don't cite what rules, contracts, contractual provisions that Evercore had with the NCOs that they violated. So where's the strong interest of fraud? If you just disagree, if your clients just disagree with their criteria for their automated system, how is that an inference of fraud? Judge, that's not it at all. What we're alleging is that over a wide swath of departments, they instituted these essentially blanket approvals that the NCOs were not told about. For example, on Labor Day, just to prove the first three procedures for any provider, on 126 other days, if it's a high volume day, do the same thing. So you're saying that in the context of the Part C structure. Yes. That any kind of administrative rule, such as those that you've just been citing, is enough to provide a strong inference of fraud. Because it is not going to provide an accurate representation of the capitation basis, is that right? Exactly, and the swarming court- But to follow up my colleague's question, so you're saying no more than an administrative rule still is an inference, provides a basis for an inference of fraudulent intent. No, what I'm saying is that we allege specifically paragraph 97 of the complaint, A156, under EvoCorp's legal and contractual obligations. After a request for a service for a beneficiary of Medicare or Medicaid is built into core path, clinical reviewers are supposed to review the request to determine whether the service is medically necessary. So you're suggesting they can't have an automated system, that there has to be a clinical review, is that what you're suggesting? What I'm suggesting is there was a contractual agreement that this is the method in which it was going to be done. So every single request you say contractually they require to have a human person review it, is that what you're suggesting? That is, well that's the allegation in the complaint, which is supposed to be assumed to be true. Yes, we did allege that. Is that what you're saying? I understand you're pointing it out. Yes, what we're saying is that what EvoCorp agreed to do was with certain patient populations and with certain claims, that they would have these reviewers according to certain criteria, which is in the contracts, okay? And our clients were told that because they were the reviewers, okay? And I point you to the NEDSA case where they say that's sufficient. Excuse me, that sounds like a breach of contract claim, not a basis for finding fraud. Fraud in the False Claims Act is a whole different animal, isn't it? Well, in the NEDSA case, in the Swobin case, where a specific systematic type of practice is instituted that the defendant knows is going to result in potentially medically unnecessary claims being submitted, and is not what they contracted to do, you're supposed to turn square corners with the government. It's fine if they want to go to MCOs and negotiate with them and say, we want to use a database, we don't want to do this. But the contract required these reviewers in specific criteria, and the allegation is they did not tell the MCOs. Why weren't your clients, were insiders in a position to give more detail about specific instances where there was no medical necessity? In fact, in paragraph 28, there's this whole discussion about this Texas Medicaid conversation where you allege that after the fact, they tried to manufacture a plausible medical necessity, but then there was no indication that, in fact, it wasn't medically necessary. So that indicated to me, okay, there were specific conversations, allegedly, about manufacturing a medical necessity after the fact, in connection with the Texas Medicaid commission. Why couldn't your client have access to records to show, and in fact, when I reviewed that file, it wasn't medically necessary. What am I missing? The issue is that our clients have, and it's not asserted that they did have access to these things. What we assert is we had access to knowledge that they weren't doing what they were- It says if you're being asked to manufacture a reason for medical necessity, doesn't it suggest you have access to particular cases and patients? Well, it may be your honor, I can't answer that because I'm not my client, but I can tell you that we attempted to get the most specificity we could from the clients based on what they could recall and what information they had. But they did allege also in paragraph 159 that the supervisor was so concerned about the fact that egregious examples were being auto approved. That she asked, she sent an email around saying, people have to put together these examples because we need to try to change this. But then they never changed it. In fact, they expanded it. Yeah. But did they put together the list of instances in which that occurred? Isn't that what you just said? I don't know. Your honor. I mean, if we had that list, we would have provided it in the complaint. If you had that list, it would have been the answer to our first question. Right. But my point is simply that there is an inference that if, in a large number of instances, including it's alleged, in this particular case, it's alleged that it covered, sorry, that it covered the not just pediatrics, but radiology, cardiology, joint surgery, radiation therapy, interventional pain procedures. This is all listed at our A138 paragraph 24, that they were doing these auto approvals to save money. They were not telling the MCOs about it. And there's a reasonable inference that that is going to result, and it did result, in medically unnecessary procedures. And that the government would not want that to occur for the reasons set forth in Swobin and set forth in our complaint, that ultimately the government's going to pay for that. Because ultimately that's going to be put into the risk pool, and the government is going to be told it's going to cost you more going forward. All right. Thank you, Mr. Stone. You deserve your three minutes for rebuttal. Thank you. Mr. Dunphy. Good morning, your honors. May it please the court. My name is Brian Dunphy on behalf of Evacor. In a 40 page well reasoned and thorough opinion, the district court properly dismissed all of the claims in the second amended complaint, or later's third complaint against Evacor. We ask this court to uphold the district court's decision for three reasons. First, the complaint fails to meet the strict standards of rule 9B. This is a false claims act case, it's a fraud case. They've alleged fraud against our client and have to meet the rigorous standards under rule 9B. That's basically what we were talking about in our column, right? Yes, exactly, your honor, that's right. And in the Gelman case, the second circuit has said that it is rigorously enforced, that the rule 9B standard is. These allegations in the complaint are conclusory. They lack the specifics required by 9B to survive the motion to dismiss. The- There are some specifics that are provided. The paragraph 128 that my colleague was just pointing to about a directive that the treatment request be presented as being reviewed for medical necessity when it's not, and so on. And why isn't a systemic kind of decision made by an institution like your client to not, to allow the presentation of claims to the government that are out of line with their contractual commitments, suggest a failure to present truthful claims to the government, such as would be cognizable under the False Claims Act? Yeah, your honor, a few things on that point. It does not, first is that prior authorization is a tool that Medicare Advantage plans, private health plans use to manage their costs, make sure they're covered, the services are covered, that they're medically necessary. It's not required that health plans and Medicare Advantage use prior authorization. Therefore, if they choose to do so, the agreements that those plans have with Evacor directs what services are required, what level of review do those health plans want Evacor to conduct? Presumably there'd be some criteria for prior approval, right? Well, there is no, not in the federal regulations, but for denials. So the concern is that if a service is going to be denied, then there must be an in-person, a physician or a clinician must review. If in fact there's, if in fact your client approved every request, had a directive, we want to approve every request in this category, no matter what, for the next six months. Wouldn't that suggest, wouldn't that provide some inference that there must be some claims in there that don't qualify, and they're not reviewing them like they're supposed to? Why isn't that enough if that's the allegation? Your Honor, that's not enough. And the reason is that, because it's up to the health plan to tell Evacor, our client, what to do and what level of review is required. And the health plan has the right, if it chooses, to say, please approve a certain type of claim. So the hurricane example he mentioned, if there's a crisis, the health plan can say, yes, please approve. You're saying that their allegation is in paragraph 103, that every pediatric developmental request would be auto-approved for a six month period to mollified providers. You're saying that's fine? The health plan can decide to do that and direct Evacor to do that. The government's okay with that too? Isn't the government, isn't that inconsistent? They would say that's inconsistent with the government regulations that require an individualized determination. Is that an individualized determination? Yeah, Your Honor, the individualized determination, well, first let me, yes. The individualized determination, I'll answer that question first. That is, there's a regulation that's cited, it's a 42 CFR 422-566. There is, the concern is a denial of service. These physicians are ordering these services and clinicians are ordering these services for their patients and making a determination that they are medically necessary. And so, the concern in the regulation, that is the basis of that. The regulation doesn't say that. The regulation doesn't say you need to have an individualized determination if you're denying. If you're granting, you can grant all you want. The regulation doesn't say that, right? The regulation does not say that, but it's important to understand how these private health plans are actually paid. And so, they receive what's called a capitated payment. They receive a fixed amount. They're private plans, so Blue Cross Blue Shield, for example, is mentioned in the complaint. So, it's a private health care plan that provides Medicare benefits to its members. It receives a payment from the government for the projected cost of caring for its members. So, based on their age, based on their health. So, there's a projection, say you're going to receive $10,000 to pay for the care for this particular member. Then the health care, its obligation, it manages those costs. So, if there's ten services provided to a member or if there's one service provided to a member, it doesn't affect the fixed payment that that health plan receives. So, it's a unique structure. It's different than Medicare. I think you're wrong about this, because I don't understand all the intricacies. Sure. I thought that the amount that your client would get the next year could be affected by how many they approve in a given year. So, maybe they won't make any more money this year, but if they approved everything, they could show the government, look how much treatment service we had to provide to our plan recipients. We need more for 2024, is that not how it works?  The government would pay the Medicare Advantage plans, it's a Blue Cross Blue Shield in my example. Based upon the, not necessarily services, it's based on health conditions. So, if a member has diabetes, for example, the plan is paid more to care for somebody who has diabetes because it's a more complex condition. So, again, whether that person who has diabetes goes and sees a physician one time or ten times. They have diabetes, that's the condition, and the payment to the health care plan is based upon that condition and that member's age. So, it's- It's okay, I didn't see this in the complaint, I thought I heard Mr. Stone say that approve everything on Labor Day. All requests that come in on Labor Day, we're going to approve those, you're saying that's okay, too? If the health plan directs the other court to take that approach, that is, because prior authorization, again, is not required. What is, so the contract that between Evacor and its health plan clients, that's what sets forth what Evacor's obligations are. And there's no allegations that, specific facts that Evacor was contracted to provide a particular review or service, a level of review, and it failed to conduct that review. That's the central question. That's why we focus on our briefing on the fact that there are no contractual terms alleged. There's no what requirements were imposed upon Evacor. Well, he did make a point to paragraph 97. I mean, it doesn't obviously cite a particular provision, but it does say under Evacor's legal and contractual obligations, after a request for service for a beneficiary, they're supposed to review it to determine whether the service is medically necessary before prior authorization would be approved. So, you're saying, no, that's not what's required. I understand it's a generalized allegation, but- You're right, that's the issue. It is a generalized allegation. So, what are the specific contractual terms? What are the regulations that impose these requirements upon Evacor? So, without those contractual terms, what is Evacor actually required to do by these health plans? because again, health plans have discretion. They've got the right, but not the obligation to choose to use prior authorization and work with companies like Evacor. And so, without showing what contractual obligations are, how they fail to meet them, it doesn't meet the standards of 9B. And another point I'd like to make is there's a use of the term auto approval throughout the complaint. And that seems to suggest that nobody was looking at anything, there was no review being conducted. The district court found, just on the allegations in the complaint, that the allegations themselves, excuse me, are confused and contradictory. They show that there was review by way of these clinical pathways, these electronic decision making tools that were developed by clinical reviewers using medical evidence. There is some, in some instances they do, although he said we didn't allege this, but they do suggest the criteria were not sufficient. So that does suggest some level of review, but in other instances, like the one I read you, they allege just auto approval over a six month period for a particular type of request, right? Because both of those are in the complaint. They are both in the complaint, that's right, your honor. And I think the point with the auto approval for six months, that again is, that reflects a conversation with the health plan and a request of the health plan. So it all comes down to what are our health plan clients asking us to do? And without further statements, some of the allegations that Mr. Stone pointed to, with 9B requires, as the court well knows, the who, what, where, when, why, how of these conversations. These relators were insiders, of course. They were clinical reviewers. It seems that they might disagree. The complaint suggests anyway that they think a clinician should review every single request. That's not required. So they may have a disagreement with that accord. But they don't bring forward the specifics to satisfy the standards of Rule 9B, which again is rigorously enforced by this court. All right, thank you. Thank you, your honors. All right, Mr. Stone, you have three minutes in the bottom. Thank you. First of all, what I think I just heard was a summary judgment argument. He's arguing that MCOs said these things were okay. That's alleged in the complaint the exact opposite, that MCOs didn't know these things were going on. And to just sort of state conclusorily that MCOs had done this, you know, like Labor Day. You have the pleading obligation, right? You have 9B. And if you don't satisfy the details, you have to pledge on information belief if you don't have access to the details. Right, and we believe- Of a strong inference of fraud. That's wrong. And we believe we've pledged that sufficiently. What I'm saying is, we've pledged the MCOs didn't know. For example, we've pledged that when an MCO canceled the contract with Evercore, they told all the reviewers just to auto approve everything from now on because they're not going to review our contract. That is not something that an MCO was told, okay? But the evidence clearly supports that Evercore was doing this to meet these 48-hour requirements that we allege were in these contracts. And to meet, to save money, because they didn't have sufficient staff. And that's number one. On the issue of the obligation to do these pre-authorization reviews, we cite, and the government in its SOI below cites regulations, which are in our complaint. We cite them in our complaint, that they have an obligation to ensure that the data is accurate. And that once they choose, as Swobin says at 1167, once they choose the way they're going to do that, which in this case was Evercore, they have to do it in good faith. Nobody would say that an MCO could hire Evercore, tell the government, we're meeting that obligation by having this subcontractor review it, and then tell the subcontractor they didn't have to review anything. So clearly, they did have an obligation, and once they had that obligation, their subcontractor had that obligation to do it in good faith. And I think Swobin is directly on point on this issue. And as for an inference, the inference is if the government is requiring that the data be accurate, and that the MCO be responsible and certify that the data is accurate, and saying that it has to make individualized determinations, that is an obligation. That had to be in the contracts, because that would be the obligation of the MCO. The government obviously reviewed this and declined to intervene. How should we look at that? If this is as obvious as you're saying under the regulations, why wouldn't the government have intervened in this case? Well, I mean, the government filed a statement of interest in this case. And the government doesn't normally file statements of interest. And it did it because it wanted to support the fact that if a subcontractor does something like this, it is submitting a claim which can support a False Claims Act liability. So I think the government, if anything, has supported us here. But as you know, you're not supposed to draw, the law is you're not supposed to draw any negative inferences. Because the government doesn't, I mean, declines cases for all kinds of reasons. All right, thank you. Thank you. We'll reserve the decision. Thank you both. Have a good day.